UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ELECTRICAL CONTRACTORS, INC., | : | Case No. 3:13-cv-00514 (MPS) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| FIDELITY & DEPOSIT CO. OF MARYLAND, | : | |
| ZURICH AM. INS. CO., | : | |
| LIBERTY MUT. INS. CO., | : | |
| WHITING-TURNER CONTRACTING CO., | : | |
| Defendants. | : | March 30, 2015 |

_____

**MEMORANDUM OF DECISION**

## I.  Introduction

In connection with the construction of a laboratory facility for the State of Connecticut, plaintiff Electrical Contractors, Inc. ("ECI"), an electrical subcontractor, entered into a subcontracting agreement ("Subcontract") with defendant Whiting-Turner Contracting Company ("W-T"), the general contractor for the project. ECI is suing W-T for breaching the Subcontract and violating the covenant of good faith and fair dealing and the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a et seq. ("CUTPA"). ECI also seeks restitution under theories of quantum meruit and unjust enrichment. Defendants Fidelity and Deposit Company of Maryland, Zurich American Insurance Company, and Liberty Mutual Insurance Company (collectively, "Sureties") are sued in their capacities as sureties for the construction project.

The defendants have filed a motion for summary judgment, which the Court will grant in part and deny in part. Most of ECI's claims are simply foreclosed by the Subcontract. The terms of the Subcontract, for example, expressly bar ECI's claim for material escalation costs. Further, the unambiguous language of the Subcontract vests ECI with very limited rights and W-T with

plenary authority to manage the work regardless of the impact on its subcontractors, thereby precluding most of the other theories of breach alleged by ECI. Although the covenant of good faith and fair dealing may impose some restrictions on W-T's exercise of its management discretion and may support ECI's claim for extra labor costs incurred as a result of W-T's alleged mismanagement of the project, ECI failed to satisfy the Subcontract's requirement that timely written notice of such a claim be presented to W-T. This is fatal to ECI's claim for "labor inefficiencies" damages. The Subcontract treats claims for compensation for "additional work" differently, however, permitting ECI to bring such claims without formal notice when certain conditions have been met. Because there is sufficient evidence that those conditions have been met as to one of the proposed "change orders" at issue, the Court must deny summary judgment as to that claim.

## II.     Facts

The following facts are based on the record construed in the light most favorable to the plaintiff:

On October 27, 2009, W-T and the former Connecticut Department of Public Works ("DPW") (now reorganized into the Division of Construction Services of the Department of Administrative Services) entered into the Construction Manager at Risk Agreement ("General Contract") to perform construction work on the State Laboratory Building in Rocky Hill ("Project"). The Sureties later issued a payment bond to W-T for the Project.[1] Exh. C to Wahl Aff.

---

[1] "Under General Statutes §§ 49-41 through 49-43 a general contractor on a public works construction project must provide a payment bond with surety to the state or governmental subdivision guaranteeing payment to those who supply labor and materials to the project, and any person who has performed work or supplied materials for the project, but has not been paid for such materials or work, may enforce his right to payment under the payment bond." *Elec. Contractors, Inc. v. Ins. Co. of State*, 104 A.3d 713, 714 (Conn. 2014).

On May 17, 2010, W-T and DPW executed an amendment to the General Contract. Exh. B to Wahl Aff. ("Amendment"). Attached to the Amendment, and incorporated into it, were several exhibits, including Exhibit D—Schedule ("Contract Schedule"), which listed the projected dates on which various tasks for the Project were to be performed.

On May 20, 2010, W-T entered into the Subcontract with ECI, under which ECI would perform electrical work for the Project for a lump sum of $3.6 million. Exh. D to Wahl Aff. Attached to the Subcontract, and incorporated into it, were several exhibits, including Exhibit B—Scope of Work, listing the electrical tasks to be completed, and Exhibit O—Schedule ("Subcontract Schedule"), which reproduced, at least in substantial part, the dates contained in the Contract Schedule. Exh. 1 to Flynn Aff. ECI began work sometime between June and August 2010, and substantially completed its work in March or April 2012.

By email dated February 22, 2011, W-T sent DPW a proposed "update" to the Contract Schedule ("Schedule Update U009"). Exh. 5 to Flynn Aff. DPW replied on February 25, 2011, saying the update was "unacceptable" in spite of the fact that there had been severe weather in January, and asking W-T to produce a "recovery schedule in order to maintain the project schedule." *Id.* W-T did not notify ECI that the schedule update had been rejected by DPW.

By letter dated April 14, 2011, DPW told W-T that it believed that W-T was not complying with the requirements of the General Contract regarding the schedule. Exh. 6 to Flynn Aff. DPW accused W-T of submitting proposed schedule "updates"—that is, information about the status of the Project—that were actually schedule "revisions"—that is, changes to the schedule. DPW believed that its authorization was required to revise the schedule, and told W-T that if it continued to submit schedule revisions, it must include a detailed narrative explaining the basis for the revisions. ECI was not made aware of this letter from DPW to W-T.

At some point, W-T's superintendents began ordering ECI to perform work in a piecemeal fashion that differed from the original schedule, often directing ECI to return to work in areas where work had previously been performed. In approximately May 2011, this began to disrupt ECI's work and make it less efficient. This problem was noted in daily reports sent by ECI's field supervisor Frank Gladwin to W-T's field superintendent John Banta. Exh. 3 to Flynn Aff.

By letter dated May 4, 2011, ECI notified W-T that it was "about to order the copper wire for this project" and was "asking for an equitable adjustment to our contract price to cover th[e] increased cost in copper wire materials," as the price of copper had risen. Exh. E to Wahl Aff ("Material Escalation Claim"). Two days later, W-T sent a letter in response, refusing to compensate ECI for the increased cost. Exh. G to Wahl Aff.

By email dated June 14, 2011, ECI project manager Cliff Clauson sent W-T a "listing of areas ECI is not able to work in due to the incomplete state of these areas." Exh. 4 to Flynn Aff. He said that, as he had been noting in his weekly reports, the Project was behind schedule, and he wanted to talk with W-T managers about the delays in further detail the next day.

By emails dated July 16, 2011, and August 18, 2011, W-T submitted two revised schedules to DPW, Schedule Update U014 and Schedule Update U015, and sought DPW's comments on the revisions. Exhs. 7, 8 to Flynn Aff. By email dated September 27, 2011, W-T issued Schedule Update U016 to the subcontractors, including ECI. Exh. 9 to Flynn Aff.

After receiving Schedule Update U016, ECI notified W-T that it believed that the update contained inaccuracies and changes to the underlying "logic" of the Project, and later met with W-T to discuss its objections. ECI wanted access to the electronic scheduling files, so that it could compare Schedule Update U016 to the original Subcontract Schedule, but W-T refused.

4

On October 20, 2011, W-T issued Contract Supplement No. 5 to ECI, which ECI signed a week later, but only after crossing out the line item that referred to Schedule Update U016. Exh. 10 to Flynn Aff.

By letter dated October 25, 2011, ECI complained to W-T that "ECI and others have been directed to hopscotch around the project, without regard to the current schedule, in an inefficient and unproductive manner" and informed W-T that "going forward, ECI will serve notice every time our work activities are forced to be altered by Whiting-Turner and we will track the impact and we will be submitting it in accordance with the contract documents." Exh. J to Wahl Aff. ECI said the letter was W-T's "formal notice that we are being impacted by all of the above referenced issues listed and we will be submitting those costs as well in the form of a claim." *Id.*

By email dated November 11, 2011, W-T notified ECI that it had waived any objection to Schedule Update U016 by failing to file a timely written claim with W-T, as required by the Subcontract. Exh. 11 to Flynn Aff. On November 15, 2011, ECI replied to the email and accused W-T of breaching the Subcontract by failing to pay ECI for additional work that W-T requested, and maintaining that ECI was under no obligation to assent to Schedule Update U016. *Id.* Replying the same day, W-T told ECI that the other provisions of Contract Supplement No. 5— under which ECI would perform additional work for additional compensation—were separate from Schedule Update U016, which was included for ECI's reference to identify the "milestones necessary to complete the project." *Id.* W-T told ECI that it could work off older schedules if it preferred.

In November 2011, ECI met with W-T, and W-T's senior project manager, William Wahl, agreed to pay ECI for its labor inefficiencies if it had to return to a work area to complete

a task. By email to W-T dated November 29, 2011, ECI followed up on that discussion, saying that ECI would return to work on certain areas as directed by W-T but "all additional labor utilized to work in this manner will be tracked and submitted later for compensation." Exh. 18 to Flynn Aff. Replying to that email the next day, Wahl restated that he "agreed to pay for the inefficiency time if you have to go back to an area to complete the work." *Id.*

By letter to W-T dated December 10, 2011, ECI again complained of "labor inefficiencies" and attached a list of "almost 200 specific areas and items of work that have been and continue to disrupt our sequencing of work," adding that ECI would "also forward to you the costs once fully ascertained." Exh. L to Wahl Aff. Most of the items listed on the attachment contain an indication of "Date Noted," with dates ranging from November 14, 2011, to November 23, 2011. The final two pages contain additional items that are not individually dated, but the first page does contain the date June 14, 2011, at the top and appears to be a copy of the list submitted by ECI via email on that date, referenced *supra*.

At some point, ECI sent several proposed change orders ("PCOs") to W-T, seeking additional compensation for work that ECI believed was beyond the scope of the original Subcontract. These included PCO #078 dealing with conduits installed in the ceilings of certain labs spaces, Exh. N to Wahl Aff., PCO #096 dealing with acid wash circuits, Exh. Q to Wahl Aff., PCO #123 dealing with a fire alarm, Exh. R to Wahl Aff., and PCO #124 dealing with a fuel leak detection system, Exh. S to Wahl Aff. W-T rejected all but PCO #078, which it submitted to DPW for approval and DPW rejected. ECI performed under protest all the work referenced in the PCOs.

By letter to W-T dated May 7, 2012, ECI submitted a "request for equitable adjustment," claiming $1.1 million in "impact damages," based on the extra hours ECI was forced to expend

as a result of "labor inefficiencies" caused by W-T's management of the Project. Exh. T to Wahl Aff. ("Request for Equitable Adjustment"). In addition, the Request for Equitable Adjustment sought compensation for (1) the copper-wire Material Escalation Claim that was previously rejected by W-T, (2) the four PCOs listed above that were previously rejected by W-T, and (3) "[o]vertime (premium portion only) that was not paid from 2/18/12 to 2/26/12." By letter dated May 30, 2012, W-T rejected the Request for Equitable Adjustment. Exh. U to Wahl Aff.

By letter dated June 5, 2012, ECI submitted a claim against the payment bond to the Sureties, and then later sent supporting documents to the Sureties by email on July 13, 2012. Exhs. W, Z to Wahl Aff. The Sureties notified ECI by email on July 16, 2012, that they "consider[ed] the entire matter to be in dispute and reserve[d] all rights and defenses." Exh. AA to Wahl Aff. By letter dated November 1, 2012, the Sureties formally denied ECI's bond claim. Exh. BB to Wahl Aff.

## III.   Legal Standard

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law." *Konikoff v. Prudential Ins. Co. of America*, 234 F.3d 92, 97 (2d Cir. 2000). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (internal quotation marks and citation omitted).

"Courts may construe unambiguous contracts as a matter of law." *Pac. Indem. Co. v. Interstate Fire & Cas. Co.*, 488 A.2d 486, 489 (Md. 1985).[2] "A term of a contract is ambiguous if, to a reasonably prudent person, the term is susceptible to more than one meaning." *Cole v. State Farm Mut. Ins. Co.*, 753 A.2d 533, 537 (Md. 2000). "[C]onstruction of [an] ambiguous contract is for the jury" if "extrinsic evidence presents disputed factual issues." *Pac. Indem. Co.*, 488 A.2d at 489. "The court may construe an ambiguous contract if there is no factual dispute in the evidence." *Id.*

## IV.    Discussion

### A.    Contract Claims (Counts One, Two, Three, and Four)

ECI's allegations pertaining to W-T's alleged breach of the parties' agreement span four counts (Count One, claiming breach of contract, Count Two, claiming breach of representations and warranties, Count Three, claiming breach of an implied warranty, and Count Four, claiming breach of the implied covenant of good faith and fair dealing[3]). The substance of ECI's claims is that W-T (1) "improperly" ordered ECI to perform additional work, (2) "failed to provide access to the work," (3) "failed to properly manage and schedule the Project," (4) "failed to maintain the Project in a state of readiness" so that ECI could perform its work "in a reasonable manner," (5) "delayed and disrupted" ECI's work, (6) "intentionally misrepresented the status of the Project," (7) misrepresented "the method by which the Project would be scheduled and constructed," (8) breached an implied warranty that the Subcontract and attached documents were accurate and

---

[2] Article 9(r) of the Subcontract provides: "This Subcontract shall be governed by the laws of the State of Maryland, without regard to principles of conflict of laws."

[3] "[T]here is no independent cause of action at law in Maryland for breach of the implied covenant of good faith and fair dealing." *Mount Vernon Properties, LLC v. Branch Banking And Trust Co.*, 907 A.2d 373, 381 (Md. App. 2006). Rather, "Maryland law recognizes an implied duty of good faith and fair dealing as applied to the performance and enforcement of the contract itself." *Polek v. J.P. Morgan Chase Bank, N.A.*, 36 A.3d 399, 416 (Md. 2012) (quotation marks omitted).

suited for their intended purposes, (9) failed to manage the Project schedule in good faith, and (10) failed to compensate ECI for its "additional" work.

As elaborated below, all but the final two claims are precluded by the unambiguous terms of the Subcontract. The good faith claim, though not as clearly precluded by the Subcontract's substantive provisions, fails because no reasonable jury could find that ECI gave W-T the proper written notice required to bring such a claim. There is, however, a genuine dispute of material fact as to a portion of the final claim for compensation for additional work.

### i. Claims Arising from the Increased Cost for ECI to Perform Base Contract Work

The Subcontract provides no legal basis for ECI's claims for the increased costs that it incurred while performing its base contract work, including costs incurred allegedly as a result of labor inefficiencies owing to W-T's mismanagement of the Project and costs incurred as a result of increased raw materials prices. The Subcontract vests ECI with very limited rights beyond its entitlement to be paid the original contract price for its work (as well as any additional compensation that has been properly claimed according to the procedures outlined in Article 6 of the Subcontract, which the Court considers *infra*, Subsection IV.A.iii). ECI has pointed to no provision in the Subcontract that grants ECI a right to demand that W-T manage the project in a particular manner or according to a particular schedule, to revise the schedule in a particular manner, or to provide ECI with accurate reports—or any reports—about the status of the Project, W-T's communications with DPW, or the scheduling process.

The Subcontract permits W-T to change schedules and requires ECI to absorb the effects of those changes:

> Subcontractor agrees to . . . complete the work in such sequence and order and according to such schedules as Contractor shall establish from time to time . . . time being of the essence. . . . If Contractor determines that the Subcontractor is

behind schedule or will not be able to maintain the schedule, Subcontractor . . . shall work overtime, shift work, or work in an altered sequence, if deemed necessary, in the judgment of the Contractor to maintain the progress of the work. Any such . . . altered sequence work required to maintain progress or to complete the work on a timely basis shall be at Subcontractor's expense and shall not entitle Subcontractor to . . . additional compensation.

Art. 4(a).

To the fullest extent permitted by applicable law, Contractor shall have the right at any time to delay or suspend the work or any part thereof without incurring liability therefore. An extension of time shall be the sole and exclusive remedy of Subcontractor for any delays or suspensions suffered by Subcontractor . . . and Subcontractor shall have no right to seek or recover from Contractor any damages or losses, whether direct or indirect, arising from or related to any delay or acceleration to overcome delay, and/or any impact or effect of such delays on the Work.

Art. 4(b).

In the interest of the overall project, W-T reserves the right to alter the sequencing of activities in order to accommodate project conditions and/or Owner requirements. It is understood that the Subcontractor shall be obligated to complete its activities [timely] . . .  regardless of the actual start date.

Exh. B § C(8).

There is no guarantee of continuous work. Subcontractor shall work in all areas as they become available and as directed by Whiting-Turner. Subcontractor shall include the inefficiencies, supervision and manpower necessary to run separate and independent crews as necessary.

Exh. B § C(14).

ECI cites portions of the General Contract, which it says are incorporated into the

Subcontract, in support of its argument that W-T owed it certain duties relating to the

management of the Project and the scheduling of work. It is true that Article 1 of the Subcontract

defines the Subcontract as including "Contract Documents," which itself is defined to include the

General Contract and related documents. But specific language in Article 9 makes clear that ECI

10

is not entitled to enforce against W-T any of the rights given to DPW by the Contract

Documents:

> In the event of variations, conflicts, ambiguities or inconsistencies between or among the terms, provisions or conditions of this Subcontract and any other Contract Documents, the terms, provisions, and conditions which grant greater rights or remedies to Contractor or impose higher standards with regard to the obligations, responsibilities and scope of work of the Subcontractor shall control. Notwithstanding any other provisions of this Subcontract or of the Contract Documents, no provision hereof shall be construed to permit Subcontractor to pursue against the Contractor rights and remedies available to the Owner against the Contractor in the General Contract unless such rights and remedies are specifically and explicitly made available to the Subcontractor herein.

Art. 9(n). In addition, Article 9(v) contains a merger clause, foreclosing the possibility that

previous understandings about ECI's rights were included in the agreement.

Therefore, nearly all of the evidence pertaining to W-T's communications with DPW and

DPW's dissatisfaction with W-T's management of the Project is immaterial to ECI's claim that

W-T breached the terms of Subcontract. Even assuming that W-T managed the Project in

violation of the General Contract and other Contract Documents, ECI is not entitled to sue W-T

for that mismanagement unless a specific term of the Subcontract has been breached, and ECI

has not identified any such term.

Similarly, ECI has pointed to no provision of the Subcontract that would entitle it to

compensation from W-T for the increased cost of copper wire, i.e., the Material Escalation

Claim. ECI cites Section 2.2.3 of the General Contract, which creates a "CMR Contingency"

fund for use by W-T—W-T being the contract manager-at-risk ("CMR")—to cover increased

costs, including material escalation costs. This right created by the General Contract belongs to

W-T, not ECI. Further, the plain language of the Subcontract forecloses any claim that ECI is

entitled to be paid for material escalation costs:

> The Contractor agrees to pay the Subcontractor for the performance of its work hereunder the following sum or sums, which shall . . . be firm and binding on the

> Subcontractor for the work and not conditioned upon a firm completion date or on any labor increases or *material escalation costs* which might occur during the course of construction.

Art. 10 (emphasis added).

Summary judgment is thus GRANTED as to Counts One, Two, and Three in relation to any claims arising from ECI's performance of base contract work, because the Subcontract expressly provides ECI with no remedy and contemplates that ECI will bear the risk that the Project may be scheduled in several different ways and the risk that ECI's costs may exceed the initial projections on which the contract price was based.

### ii. The Implied Covenant of Good Faith and Fair Dealing, and the Notice Requirement

Arguably, the implied covenant of good faith and fair dealing does provide ECI with a basis for a claim against W-T. Although, as already discussed, the Subcontract unambiguously grants W-T complete discretion over the scheduling and sequencing of ECI's work, an entirely unreasonable use of that discretion might amount to a breach of the implied covenant.[4] The Court need not decide that issue, however, because ECI has failed to produce evidence to rebut W-T's contention that timely written notice of ECI's claims was not provided, as required by the Subcontract.

Article 6(d) permits ECI to submit claims to W-T "[i]n the event of *any* dispute, controversy, or claim for additional compensation," other than compensation for "additional work," which is governed by Article 6(a). Art. 6(d) (emphasis added). Because ECI concedes that its claim for increased costs for labor inefficiencies caused by W-T's abuse of the

---

[4] "[T]he obligation of good faith and fair dealing requires a party exercising discretion to do so in accordance with the reasonable expectations of the other party." *Questar Builders, Inc. v. CB Flooring, LLC*, 978 A.2d 651, 675 (Md. 2009) (quotation marks omitted); *but see id.* at 675-76 ("What constitutes a 'reasonable expectation,' of course, depends on the language of the contract."); *Polek v. J.P. Morgan Chase Bank, N.A.*, 36 A.3d 399, 416 (Md. 2012) ("Absent special circumstances . . . no new obligations on the parties are imposed, where the contract is silent, by the implied covenant of good faith and fair dealing.").

management discretion conferred on it by the Subcontract did not involve "additional work" beyond the base contract, Pl.'s Br. at 21, and because that claim plainly seeks "additional compensation," it is subject to Article 6(d).

Article 6(d) requires timely written notice as a precondition for making such claims: "[N]otice in writing shall be given to the Contractor no later than seven (7) days following the occurrence on which such claim is based . . . . Any claim not presented within such time period shall be deemed waived by Subcontractor." *Id*. The notice must "describe the dispute, controversy or claim in detail so as to allow Contractor to review its merits . . . [and] provide detailed information to substantiate such claim including supporting documentation and calculations." *Id.* Such notice requirements are enforceable as preconditions to bringing claims, except where waiver or estoppel can be proven. *Rea Const. Co. v. State Roads Comm'n*, 174 A.2d 577, 579 (Md. 1961); *see also Barclay White Skanska, Inc. v. Battelle Mem'l Inst.*, 262 F. App'x 556, 564-65 (4th Cir. 2008) (noting that the court in *J. Roland Dashiell & Sons, Inc. v. County Comm'rs of Caroline County*, No. 677 (Md. App. Feb. 22, 1999) (unpublished opinion) had found that a letter indicating intent to recover unspecified delay damages for events occurring up to six months earlier was untimely under a 21-day notice provision).

Although ECI claims that W-T "waived its right to insist on strict compliance with the notice provision," no reasonable jury could make such a finding. Where, as here, a contract contains a non-waiver provision, *see* Art. 9(s) ("Neither party hereto may waive or release any of its rights under this Agreement, except in writing."), "[t]he party alleging waiver must show an intent to waive both the contract provision at issue and the non-waiver clause." *Hovnanian Land Inv. Grp., LLC v. Annapolis Towne Ctr. at Parole, LLC*, 25 A.3d 967, 984 (Md. 2011).

13

In support of its waiver argument, ECI alleges that W-T "ha[d] actual knowledge of [ECI's] claim and [wa]s not prejudiced by the alleged noncompliance" with the notice requirement, but it has pointed to no evidence suggesting that ECI intended to waive the requirement. To the contrary, the record shows that W-T repeatedly insisted upon compliance with the seven-day notice provision. *See* Exh. 9 to Flynn Aff. (September 27, 2011 email regarding Schedule Update U016) ("All concerns related to this schedule MUST be provided formally to WT in accordance with the terms and conditions of the contract."); Exh. 11 to Flynn Aff. (November 11-15, 2011 email exchange) ("Once again, the contract requires all claims to be made within seven (7) days . . . ."). ECI cites the November 30, 2011 email in which Wahl wrote that he "agreed to pay for the inefficiency time if you have to go back to an area to complete the work," but that email was written in reply to an earlier email in which ECI said that "all additional labor utilized to work in this manner will be tracked and submitted later for compensation." Exh. 18 to Flynn Aff. Read in context, Wahl clearly meant that W-T would pay for inefficiency claims *if* ECI submitted those claims properly in the future.

The record does not support a finding that ECI provided W-T with the required written notice of its claim for compensation for labor inefficiencies arising from W-T's management of the Project. With the possible exception of the May 4, 2011 letter raising the Material Escalation Claim—which is separate from the issue of inefficiencies and which fails for reasons set forth above—the written correspondence between ECI and W-T does not satisfy the requirements of Article 6(d).

The daily and weekly reports prepared by ECI's supervisors, even if they did note certain inefficiencies, did not notify W-T that ECI was making a *claim* against W-T. Thus, contrary to ECI's assertions, they did not furnish W-T with "actual knowledge of a *claim*," as opposed to

knowledge of conditions affecting coordination of work among subcontractors. The same is true of the June 14, 2011 email from Clauson. Exh. 4 to Flynn Aff. ("[A]ttached is a listing of areas ECI is not able to work in due to the incomplete state of these areas. . . . These delays are due to your subcontractors not completing their work to allow ECI to follow behind them. We would like to be able to start working . . . . I would like to talk in detail about this tomorrow after the meeting. Please let me know when you will be available.").

The letter dated October 25, 2011, went further towards putting W-T on notice that the matter was headed towards a dispute or claim, but it was still only a general warning that *in the future* ECI *would* be submitting claims for additional compensation, as distinguished from an actual present claim. *See Cnty. Comm'rs of Caroline Cnty. v. J. Roland Dashiell & Sons, Inc.*, 747 A.2d 600, 604 (Md. 2000) ("[Respondent] indicated that said claim *would be* filed . . . . Neither of these letters constituted a proper claim in compliance with [the contract]. Instead these letters merely indicated that respondent intended to file claims in the future.") (emphasis in original).

In the October 25 letter to W-T, ECI began by briefly describing, in a single paragraph, the problems that it had been encountering, echoing the concerns raised in Clauson's June 14 email. Exh. J to Wahl Aff. The letter said that "ECI and others have been directed to hopscotch around the project, without regard to the current schedule, in an inefficient and unproductive manner" and that "ECI is still being held up by incomplete work on core-ground, 2nd and 3rd levels, missing equipment, cable tray delayed, missing door frames and framing in general." *Id.* The letter then warned that, at some point in the future, W-T might be held liable to the subcontractors for the inefficiencies:

> Obviously the CM has the right to manage the work and modify the project
> schedule for time to time. However, when the CM does so it becomes liable to the

> sub for additional compensation if such a change negatively impacts the sub. . . .
> Be advised that *going forward*, ECI *will* serve notice every time our work
> activities are forced to be altered by Whiting-Turner and we *will* track the impact
> and we *will* be submitting it in accordance with the contract documents.
> Additionally, consider this your formal notice that we . . . *will* be submitting those
> costs as well in the form of a claim and as per our contract.

*Id.* (emphasis added).

Aside from the mention of W-T's potential liability to the subcontractors, the October 25 letter was essentially the same as the June 14 email—that is, apprising W-T of the problems encountered by ECI. There were no other indicators that the letter was intended as a specific claim for further compensation—no attached documentation, no reference to the date when a claim arose, no attempt to quantify the claim or any representation that quantification was forthcoming. Indeed, the final sentences of the letter were a strong indication that the letter was not a claim. ECI concluded the letter by clearly and repeatedly expressing that any claims would be submitted *in the future*.

Like the October letter, the November 29, 2011 email did express that ECI believed that W-T had potential liability to ECI for additional compensation. Exh. 18 to Flynn Aff. But even more so than the October letter, the one-paragraph email was completely lacking in specifics or any indicators that it was a present claim. And as in the October letter, ECI made clear that this was a warning of *future* claims: "all additional labor utilized in this manner *will* be tracked and submitted *later* for compensation." *Id.* (emphasis added).

The only written communications that could be construed as claims were untimely. In the November 11-15, 2011 email exchange ECI objected to Schedule Update U016 and claimed that W-T was in breach of the Subcontract, but Schedule Update U016 had been emailed to ECI on September 27, 2011, a good deal more than seven days prior. As to the letter dated December 10,

2011, all of the specific claims listed were dated as having occurred well more than seven days prior—the latest claim being dated November 23, 2011.

Finally, the Request for Equitable Adjustment dated May 7, 2012, restated the Material Escalation Claim (which failed for independent reasons, as shown) and the PCOs (discussed *infra* Subsection IV.A.iii), and added a claim for overtime hours not paid during February 2012, as well as the large $1.1 million claim for "impact damages" based on W-T's overall mismanagement of the Project. The overtime claim was plainly untimely. As for the "impact damages" claim, Article 6(d) of the Subcontract requires notice within seven days of an "occurrence." Although there could of course be multiple occurrences of inefficiency caused by W-T—potentially including instances as late as April 30, 2012, for which the May 7, 2012 letter would have been timely notice (all parties agree that ECI's work was substantially completed some time in April 2012)—the Request for Equitable Adjustment provides no dates for specific instances of inefficiency. Instead, the Request for Equitable Adjustment makes a global claim about W-T's overall management of the project. Even if such a claim were contemplated by Article 6(d), notice of the claim given after the full completion of ECI's work could not possibly be timely. ECI itself claims that it had been aware of the *general* issue of W-T's inefficient scheduling as far back as May 2011, and it had sufficient awareness of specific inefficiencies to make an earlier, but still untimely, claim in the December 10, 2011 letter.

Although the seven-day notice requirement is strict, the parties are sophisticated business entities capable of assuming such obligations knowingly. *Smelkinson Sysco v. Harrell*, 875 A.2d 188, 196 n.5 (Md. App. 2005) ("When parties are sophisticated and externalities are absent, courts do not review the parties' contractual choices for reasonableness."). Further, under Articles 9(e) and 9(u) of the Subcontract, ECI represented that it had had an opportunity to

17

consult an attorney, had "carefully examined" the Subcontract, and "fully underst[oo]d and c[ould] perform all requirements."

The Subcontract makes clear that time is of the essence with regard to the Project. The notice requirement serves the rational business purpose of encouraging subcontractors to raise disputes soon after they arise so that they can be resolved quickly, efforts can be made to prevent similar disputes in the future, and W-T, as the general contractor, can keep the Project in motion without concern that it will be forced to revisit portions of the Project from which it has already moved on.

While there might conceivably be extraordinary circumstances that would justify ECI's delay in notifying W-T and thereby toll the seven-day period, ECI has pointed to nothing in the record that would justify its delay. The record does include statements by ECI to the effect that the costs it was incurring from labor inefficiencies were difficult and time-consuming to quantify. That argument might excuse a delay in *quantifying* a claim under Article 6(d), but it does not excuse a failure to give notice within seven days that ECI is *making* a claim as to a specific occurrence.

Thus, even if ECI's claims relating to its base contract work could be brought under a theory that W-T managed the Project so unreasonably as to breach the implied covenant of good faith and fair dealing, ECI waived those claims by failing to present written notice of specific claims to W-T in a timely fashion. Summary judgment is GRANTED as to Count Four in relation to any claims arising from ECI's performance of base contract work.

### iii.    Claims for Additional Work Referenced in the PCOs

The remaining contractual claim—that W-T failed to compensate ECI for "additional work"—encompasses only the four PCOs submitted by ECI. There is a factual dispute about

whether the work referenced in those PCOs was base contract work or, as ECI contends, "additional work," Pl.'s Br. at 21, a dispute that must be resolved in favor of ECI, the nonmoving party, at this stage. As "additional work," the PCOs would be governed by Article 6(a) of the Subcontract, not Article 6(d) with its notice requirement. Further, unlike the labor inefficiency claims, claims for compensation for "additional work" are not foreclosed by the provisions of the Subcontract under which ECI assumed the risk for increased costs, *see supra* Subsection IV.A.i, because Article 6(a) expressly provides for further compensation for "additional work" under certain conditions.

Those conditions include a requirement that the additional work be "first expressly authorized by the Contractor in writing" and that "payment [be] made by the Owner to the Contractor for such extra work." Art. 6(a). Although Article 6(a), echoing Article 6(d)'s notice requirement, provides ECI only seven days after being directed to complete the additional work to submit a proposed price, it also provides for default compensation in the event that ECI fails to submit a proposal. In that case, ECI "agrees to do the work on the basis of its actual cost plus percentage fees for overhead and profit as set forth in Article 10." *Id.* Therefore, even if ECI did not timely respond to W-T's order to perform additional work, it could still claim the default compensation.

As to the work referenced in PCOs #096 (acid wash circuits) and #124 (fuel leak detection system), ECI has submitted no evidence showing that W-T expressly authorized that work in writing prior to its being performed. Summary judgment is therefore GRANTED as to ECI's claim to be compensated for that work.

But as to the work referenced in PCOs #078 (ceiling conduits) and #123 (fire alarm), ECI has produced email exchanges in which W-T instructed ECI to proceed with the work, while also

19

stating its view that the work was base contract work. As Article 6(a) requires only that the *work* be authorized by W-T, and not that W-T consent to label it "additional" work, ECI has produced sufficient evidence to establish that that condition was met.

> The second condition, the "pay-when-paid" clause, provides:

> The Contractor shall not be liable for payment for any additional work performed by the Subcontractor unless . . . payment is made by the Owner to the Contractor for such extra work, payment by Owner to Contractor being a condition precedent for Contractor to pay Subcontractor for such work.

Art. 6(a). Although this provision does not obligate W-T to seek payment from DPW for additional work that W-T directs ECI to perform, it is reasonable for ECI to expect that W-T would act in good faith and seek payment from DPW with respect to additional work it had approved before invoking the pay-when-paid clause. *Questar Builders, Inc. v. CB Flooring, LLC*, 978 A.2d 651, 675 (Md. 2009) (quotation marks omitted) ("[T]he obligation of good faith and fair dealing requires a party exercising discretion to do so in accordance with the reasonable expectations of the other party."). Any other construction would allow W-T to direct ECI to do additional work and then defeat any claim for payment merely by refusing to submit the additional work to DPW.

There is no dispute that W-T submitted PCO #078 to DPW, which deemed the claim non-compensable, thereby allowing W-T to invoke the pay-when-paid clause. Summary judgment is therefore GRANTED as to ECI's claim to be compensated for the work referenced in PCO #078. But there is a genuine factual dispute about whether W-T ever sought payment for PCO #123 from DPW. Read in light of the covenant of good faith and fair dealing, the pay-when-paid clause would not bar ECI from seeking compensation for PCO #123, even though W-T was itself not paid for the additional work, if W-T neglected to submit PCO #123 to DPW. Summary judgment is therefore

DENIED as to ECI's claim to be compensated for the work referenced in PCO #123 (fire alarm).[5]

### B.     Quantum Meruit and Unjust Enrichment (Count Five)

In Count Five, ECI seeks to recover the fair and reasonable value of the services and materials provided to W-T under theories of quantum meruit and unjust enrichment. Because the relief sought by ECI is already addressed by the express terms of the Subcontract, these claims fail as a matter of law.

"Both unjust enrichment and quantum meruit are doctrines allowing damages for restitution, that is, the restoration to a party of money, services or goods of which he or she was deprived that benefited another." *United Coastal Indus., Inc. v. Clearheart Const. Co.*, 802 A.2d 901, 906 (Conn. App. 2002). "Quantum meruit is usually a remedy based on implied contract and usually relates to the benefit of work, labor or services received by the party who was unjustly enriched, whereas unjust enrichment relates to a benefit of money or property and applies when no remedy is available based on the contract." *Id.* (citations omitted).

Although a plaintiff may plead such claims in the alternative alongside a claim for breach of contract in order to provide a remedy in the event that the contract provides no remedy, *id.* at 905, "[a] party may not recover the reasonable value of services rendered, pursuant to the doctrine of quantum meruit, when the actions for which it seeks relief were governed by an express contract," *David M. Somers & Associates, P.C. v. Busch*, 927 A.2d 832, 840 (Conn. 2007); *see also Rosick v. Equip. Maint. & Serv., Inc.*, 632 A.2d 1134, 1141-42 (Conn. App. 1993) (rejecting subcontractor's quantum meruit claim for "extra" work where contract already provided procedure for subcontractor to submit claims for such work). Similarly, "[a] valid contract defines the obligations of the parties as to matters within its scope, displacing to that

---

[5] ECI sought $18,253 for this work in the original PCO.

extent any inquiry into unjust enrichment." *Kelley v. Five S Grp., LLC*, 45 A.3d 647, 654 (Conn. App. 2012) (alteration in original; quotation marks omitted); *see also Cooper v. PSI Grp., Inc.*, 364 F. App'x 681, 683 (2d Cir. 2010) (rejecting unjust enrichment claim where express written agreements already "addressed the subject of commissions") (citing *Meaney v. Connecticut Hosp. Ass'n, Inc.*, 735 A.2d 813 (Conn. 1999)).

The Subcontract addresses the subject of ECI's compensation for its provision of materials and services to W-T, both as to base contract work and as to additional work. Although ECI initially alleged that W-T's actions "constituted an intentional abandonment of the Subcontract," Compl. ¶ 36, ECI has produced no evidence from which a reasonable fact-finder could conclude that the contract was abandoned and thereby dissolved, *see Grauel v. Rohe*, 43 A.2d 201, 204-05 (Md. 1945) ("If one of the parties to a contract refuses to perform it the other party . . . may stand upon his contract, refusing assent to his adversary's attempt to rescind it, and sue for a breach . . . or he may assent to its abandonment, and so effect a dissolution of the contract by the mutual and concurring assent of both parties. . . . [P]roof must be clear and positive in order to establish the rescission, cancellation, or abandonment of the agreement."). The Subcontract therefore precludes ECI's claims for quantum meruit and unjust enrichment, and summary judgment is GRANTED as to Count Five.

### C.     CUTPA Claim (Count Six)

In Count Six, ECI seeks damages under CUTPA for unfair trade practices committed by W-T. Because ECI points to no evidence of unfair conduct and instead merely references the claims already brought under the Subcontract, summary judgment will be granted on this count.

"It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the federal trade commission for determining

22

when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise . . . (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]." *Ramirez v. Health Net of Northeast, Inc.*, 938 A.2d 576, 589 (Conn. 2008) (alterations in original). "All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Id.* "[A] breach of contract standing alone does not offend public policy" absent "aggravating circumstances surrounding the breach." *Boulevard Associates v. Sovereign Hotels, Inc.*, 72 F.3d 1029, 1039 (2d Cir. 1995). Where a claim under CUTPA "duplicates" a breach of contract claim, "rejection of the latter disposes of the former." *Omni Corp. v. Sonitrol Corp.*, 303 F. App'x 908, 911 (2d Cir. 2008).

ECI claims that W-T's actions were immoral, unethical, and unscrupulous but merely incorporates W-T's "aforementioned acts and omissions." Pl.'s Br. at 40. ECI points to no specific evidence in the record to support the notion that W-T's conduct was immoral, unethical, or unscrupulous. *See In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, No. 09 CV 680 AKH, 2014 WL 4446153, at *11 (S.D.N.Y. Sept. 9, 2014) ("[I]n deciding a motion for summary judgment, a District Court is not required to 'scour the record on its own in a search for evidence' where the non-moving party fails to adequately present it.") (quoting *CILP Assocs. LP v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 125 (2d Cir. 2013)). And to the extent that ECI's claim is built upon the same evidence as its claims under the Subcontract, the Court has already considered that evidence and found no genuine factual dispute as to whether W-T acted within the bounds of the Subcontract. No reasonable jury could conclude from that evidence,

23

even construed in the light most favorable to ECI, that W-T engaged in immoral, unethical, or unscrupulous conduct. Summary judgment is therefore GRANTED as to Count Six.

### D.      Obligations of Sureties under Conn. Gen. Stat. § 49-42 (Count Seven)

In Count Seven, ECI seeks to enforce its right to payment under the bond issued by the Sureties. Although ECI has presented evidence that it provided the Sureties with notice of its payment claim, in accordance with Conn. Gen. Stat. § 49-42, the Sureties are entitled to assert the same defenses as W-T.[6] And a recent decision by the Connecticut Supreme Court forecloses ECI's argument that the Sureties forfeited those defenses by failing to respond to ECI's claim within ninety days. *Elec. Contractors, Inc. v. Ins. Co. of State*, 104 A.3d 713, 723-24 (Conn. 2014) ("[T]he ninety day response requirement contained in § 49-42(a) is directory, rather than mandatory, and . . . the legislature did not intend that a surety that fails to pay or to deny a claim by the statutory deadline thereby waives any substantive defenses and forfeits its right to contest the merits of the claim."). Therefore, the Sureties' liability is no greater than W-T's, and summary judgment is GRANTED as to Count Seven, except as to the claim for compensation for the additional work referenced in PCO #123.

---

[6] "'Because a guarantor's contract is ancillary to that of the debtor, suretyship law [permits] the surety to assert the defenses or the discharge of his debtor unless the very purpose of the suretyship was to shift the risk of this event from the creditor to the surety,' as in the event of bankruptcy or infancy of the debtor." *Cadle Co. of Connecticut v. C.F.D. Dev. Corp.*, 689 A.2d 1166, 1169 (Conn. App. 1997) (alterations in original) (quoting *American Oil Co. v. Valenti*, 426 A.2d 305 (Conn. 1979)).

**V.    Conclusion**

For the reasons above, the defendants' Motion for Summary Judgment (ECF No. 32) is GRANTED IN PART AND DENIED IN PART. The case proceeds only as to the plaintiff's claim for compensation for the additional work on the fire alarm system referenced in Proposed Change Order #123.

**SO ORDERED** this 30th day of March, 2015, at Hartford, Connecticut.

_____/s/_____
Michael P. Shea
United States District Judge